**PRINCETON UNIVERSITY PRESS, Macmillan, Inc., and St. Martin's Press, Inc., Plaintiffs–Appellees,**

v.

**MICHIGAN DOCUMENT SERVICES, INC., and James M. Smith, Defendants–Appellants.**

**No. 94–1778.**

United States Court of Appeals, Sixth Circuit.

Reargued June 12, 1996.

Decided Nov. 8, 1996.

---

J. Michael Huget, James E. Stewart, Butzel Long, Detroit, MI, Ronald S. Rauchberg (reargued and rebriefed), Herman L. Goldsmith, Proskauer, Rose, Goetz & Mendelsohn, New York City, for Princeton University Press.

J. Michael Huget, Butzel Long, Detroit, MI, Ronald S. Rauchberg, Herman L. Goldsmith, Proskauer, Rose, Goetz & Mendelsohn, New York City, Jon A. Baumgarten, Proskauer, Rose, Goetz & Mendelsohn, Washington, DC, for MacMillan, Inc., St. Martin's Press, Inc.

David G. Chardavoyne, Louise A. Marcotty, Bodman, Long & Dahling, Detroit, MI, Susan M. Kornfield (reargued and rebriefed), Lydia P. Loren, Bodman, Longley & Dahling, Ann Arbor, MI, for Michigan Document Services, Inc., James M. Smith.

Lyman Ray Patterson, University of Georgia School of Law, Athens, GA, for amicus curiae Concerned Professors of Copyright Law.

R. Bruce Rich and Elizabeth Stotland Weiswasser (briefed), Weil, Gotshal & Manges, New York City, for amicus curiae Copyright Clearance Center, Inc.

Michael E. Hobbs, Attorney General of Georgia, Atlanta, GA, for amicus curiae Attorney General of State of Georgia, National School Boards Association, Georgia School Boards Association, California School Boards Association, American Association of School Administrators.

Raymond J. Kelly, Jr. (briefed), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for amicus curiae Follett Corp.

Stephen E. Gillen (briefed), Frost & Jacobs, Cincinnati, OH, for amicus curiae National Music Publisher's Association, Inc., National Association of College Stores, Inc.

Before MARTIN, Chief Judge; MERRITT, KENNEDY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, and COLE, Circuit Judges.

NELSON, J., delivered the opinion of the court, in which KENNEDY, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER and COLE, JJ., joined. MARTIN, C.J. (pp. 1393–94), MERRITT, J. (pp. 1394–97), and RYAN, J. (pp. 1397–1412), delivered separate dissenting opinions, with Judge DAUGHTREY joining in Judge MERRITT'S and Judge RYAN'S dissents, and Judge MOORE joining in Judge MERRITT'S dissent.

DAVID A. NELSON, Circuit Judge.

This is a copyright infringement case. The corporate defendant, Michigan Document Services, Inc., is a commercial copyshop that reproduced substantial segments of copyrighted works of scholarship, bound the copies into "coursepacks," and sold the coursepacks to students for use in fulfilling reading assignments given by professors at the University of Michigan. The copyshop acted without permission from the copyright holders, and the main question presented is whether the "fair use" doctrine codified at 17 U.S.C. § 107 obviated the need to obtain such permission.

Answering this question "no," and finding the infringement willful, the district court entered a summary judgment order in which the copyright holders were granted equitable relief and were awarded damages that may have been enhanced for willfulness. *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 855 F.Supp. 905 (E.D.Mich. 1994). A three-judge panel of this court reversed the judgment on appeal, but a majority of the active judges of the court subsequently voted to rehear the case *en banc*. The appeal has now been argued before the full court.

■ We agree with the district court that the defendants' commercial exploitation of the copyrighted materials did not constitute fair use, and we shall affirm that branch of the district court's judgment. We believe that the district court erred in its finding of willfulness, however, and we shall vacate the damages award because of its possible linkage to that finding.

## I

Thanks to relatively recent advances in technology, the coursepack—an artifact largely unknown to college students when the author of this opinion was an undergraduate—has become almost as ubiquitous at American colleges and universities as the conventional textbook. From the standpoint of the professor responsible for developing and teaching a particular course, the availability of coursepacks has an obvious advantage; by selecting readings from a variety of sources, the professor can create what amounts to an anthology perfectly tailored to the course the professor wants to present.

The physical production of coursepacks is typically handled by a commercial copyshop. The professor gives the copyshop the materials of which the coursepack is to be made up, and the copyshop does the rest. Adding a cover page and a table of contents, perhaps, the copyshop runs off as many sets as are needed, does the necessary binding, and sells the finished product to the professor's students.

Ann Arbor, the home of the University of Michigan, is also home to several copyshops. Among them is defendant Michigan Document Services (MDS), a corporation owned by defendant James Smith. We are told that MDS differs from most, if not all, of its competitors in at least one important way: it does not request permission from, nor does it pay agreed royalties to, copyright owners.

Mr. Smith has been something of a crusader against the system under which his competitors have been paying agreed royalties, or "permission fees" as they are known in the trade. The story begins in March of 1991, when Judge Constance Baker Motley, of the United States District Court for the Southern District of New York, decided the first reported case involving the copyright implications of educational coursepacks. See *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522 (S.D.N.Y.1991), holding that a Kinko's copyshop had violated the copyright statute by creating and selling coursepacks without permission from the publishing houses that held the copyrights. After *Kinko's*, we are told, many copyshops that had not previously requested permission

from copyright holders began to obtain such permission. Mr. Smith chose not to do so. He consulted an attorney, and the attorney apparently advised him that while it was "risky" not to obtain permission, there were flaws in the *Kinko's* decision. Mr. Smith also undertook his own study of the fair use doctrine, reading what he could find on this subject in a law library. He ultimately concluded that the *Kinko's* case had been wrongly decided, and he publicized this conclusion through speeches, writings, and advertisements. His advertisements stressed that professors whose students purchased his coursepacks would not have to worry about delays attendant upon obtaining permission from publishers.

Not surprisingly, Mr. Smith attracted the attention of the publishing industry. Three publishers—Princeton University Press, MacMillan, Inc., and St. Martin's Press, Inc.—eventually brought the present suit against Mr. Smith and his corporation.

Each of the plaintiff publishers maintains a department that processes requests for permission to reproduce portions of copyrighted works. (In addition, copyshops may request such permission through the Copyright Clearance Center, a national clearinghouse.) Macmillan and St. Martin's, both of which are for-profit companies, claim that they generally respond within two weeks to requests for permission to make copies for classroom use. Princeton, a non-profit organization, claims to respond within two to four weeks. Mr. Smith has not put these claims to the test, and he has not paid permission fees.

The plaintiffs allege infringement of the copyrights on six different works that were excerpted without permission. The works in question, and the statistics on the magnitude of the excerpts, are as follows: Nancy J. Weiss, *Farewell to the Party of Lincoln: Black Politics in the Age of FDR* (95 pages copied, representing 30 percent of the entire book); Walter Lippmann, *Public Opinion* (45 pages copied, representing 18 percent of the whole); Robert E. Layne, *Political Ideology: Why the American Common Man Believes What He Does* (78 pages, 16 percent); Roger Brown, *Social Psychology* (52 pages, 8 per-

cent); Milton Rokeach, *The Nature of Human Values* (77 pages, 18 percent); James S. Olson and Randy Roberts, *Where the Domino Fell, America and Vietnam, 1945–1950* (17 pages, 5 percent). The extent of the copying is undisputed, and the questions presented by the case appear to be purely legal in nature.

## II

The fair use doctrine, which creates an exception to the copyright monopoly, "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994), quoting *Stewart v. Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 1768, 109 L.Ed.2d 184 (1990). Initially developed by the courts, the doctrine was codified at 17 U.S.C. § 107 in 1976. Congress used the following formulation in Section 107:

> "[T]he fair use of a copyrighted work, including such use by reproduction in copies ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work...."

■ This language does not provide blanket immunity for "multiple copies for classroom use." Rather, "whether a use referred to in the first sentence of Section 107 is a fair use in a particular case ... depend[s] upon the application of the determinative factors." *Campbell*, 510 U.S. at 578 n. 9, 114 S.Ct. at 1170 n. 9, quoting S.Rep. No. 94–473, p. 62.[1]

The four statutory factors may not have been created equal. In determining whether a use is "fair," the Supreme Court has said that the most important factor is the fourth, the one contained in 17 U.S.C. § 107(4). See *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566, 105 S.Ct. 2218, 2233, 85 L.Ed.2d 588 (1985), citing 3 M. Nimmer, *Copyright* § 13.05[A], at 13–76 (1984). (But see *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 926 (2d Cir.1994), *cert. dismissed*, —— U.S. ——, 116 S.Ct. 592, 133 L.Ed.2d 486 (1995), suggesting that the Supreme Court may now have abandoned the idea that the fourth factor is of paramount importance.) We take it that this factor, "the effect of the use upon the potential market for or value of the copyrighted work," is at least *primus inter pares*, figuratively speaking, and we shall turn to it first.

■ The burden of proof as to market effect rests with the copyright holder if the challenged use is of a "noncommercial" nature. The alleged infringer has the burden, on the other hand, if the challenged use is

---

1. Judge Merritt's dissent rejects this proposition and asserts, in effect, that under the plain language of the copyright statute the making of multiple copies for classroom use constitutes fair use *ipso facto*. Judge Merritt's reading of the statute would be unassailable if Congress had said that "the use of a copyrighted work for purposes such as teaching (including multiple copies for classroom use) is not an infringement of copyright." But that is not what Congress said. It said, rather, that "the fair use of a copyrighted work, *including such use* [*i.e.* including "fair use"] ... for purposes such as ... teaching (including multiple copies for classroom use) ... is not an infringement of copyright."

When read in its entirety, as Judge Ryan's dissent correctly recognizes, the quoted sentence says that *fair use* of a copyrighted work for purposes such as teaching (including multiple copies for classroom use) is not an infringement. And the statutory factors set forth in the next sentence must be considered in determining whether the making of multiple copies for classroom use is a fair use in "any particular case," just as the statutory factors must be considered in determining whether any other use referred to in the first sentence is a fair use in a particular case. To hold otherwise would be to subvert the intent manifested in the words of the statute and confirmed in the pertinent legislative history.

"commercial" in nature. *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). In the case at bar the defendants argue that the burden of proof rests with the publishers because the use being challenged is "noncommercial." We disagree.

It is true that the use to which the materials are put by the students who purchase the coursepacks is noncommercial in nature. But the use of the materials by the students is not the use that the publishers are challenging. What the publishers are challenging is the duplication of copyrighted materials for sale by a for-profit corporation that has decided to maximize its profits—and give itself a competitive edge over other copyshops—by declining to pay the royalties requested by the holders of the copyrights.[2]

The defendants' use of excerpts from the books at issue here was no less commercial in character than was *The Nation* magazine's use of copyrighted material in *Harper & Row,* where publication of a short article containing excerpts from the still unpublished manuscript of a book by President Ford was held to be an unfair use. Like the students who purchased unauthorized coursepacks, the purchasers of *The Nation* did not put the contents of the magazine to commercial use—but that did not stop the Supreme Court from characterizing the defendant's use of the excerpts as "a publication [that] was commercial as opposed to nonprofit...." *Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231. And like the use that is being challenged in the case now before us, the use challenged in *Harper & Row* was "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Id.,* quoting *Sony,* 464 U.S. at 451, 104 S.Ct. at 793.[3]

The strength of the *Sony* presumption may vary according to the context in which it arises, and the presumption disappears entirely where the challenged use is one that transforms the original work into a new artistic creation. See *Campbell,* 510 U.S. at 587–89, 114 S.Ct. at 1176. Perhaps the presumption is weaker in the present case than it would be in other contexts. There *is* a presumption of unfairness here, nonetheless, and we are not persuaded that the defendants have rebutted it.

■ If we are wrong about the existence of the presumption—if the challenged use is not commercial, in other words, and if the plaintiff publishers have the burden of proving an adverse effect upon either the potential market for the copyrighted work or the potential value of the work—we believe that the publishers have carried the burden of proving a diminution in potential market value.

One test for determining market harm—a test endorsed by the Supreme Court in *Sony, Harper & Row,* and *Campbell*—is evocative of Kant's categorical imperative. "[T]o negate fair use," the Supreme Court has said,

2. Two of the dissents suggest that a copyshop merely stands in the shoes of its customers and makes no "use" of copyrighted materials that differs materially from the use to which the copies are put by the ultimate consumer. But subject to the fair use exception, 17 U.S.C. § 106 gives the copyright owner the "exclusive" right "to reproduce the copyrighted work in copies...." And if the fairness of making copies depends on what the ultimate consumer does with the copies, it is hard to see how the manufacture of pirated editions of any copyrighted work of scholarship could ever be an unfair use. As discussed in Part III A, *infra,* the dissenters' suggestion—which proposes no limiting principle—runs counter to the legislative history of the Copyright Act and has properly been rejected by the courts.

3. Judge Ryan's dissent maintains that there cannot be an "exploitation" of a copyrighted work unless the exploiter assesses the work's market potential, makes a selection based on content, and realizes a profit from the substance of the work. But the dictionary defines "exploit" in terms that include "to take advantage of, utilize," see *Webster's Third New International Dictionary (Unabridged),* and nothing in *Harper & Row* suggests that the Supreme Court intended a narrower or more idiosyncratic meaning.

The dissent also points out that it was magazine employees, not outsiders, who obtained the unpublished manuscript of the Ford book and selected the portions that were included in the offending article. But nothing turns on the "in house" character of such activities. If a college professor had obtained the manuscript, selected the excerpts and peddled the article on a free-lance basis, can anyone doubt that it would have been a violation of the copyright for *The Nation* to publish the professor's article?

"one need only show that *if the challenged use 'should become widespread, it would adversely affect the potential market* for the copyrighted work.'" *Harper & Row,* 471 U.S. at 568, 105 S.Ct. at 2234, quoting *Sony,* 464 U.S. at 451, 104 S.Ct. at 793 (emphasis supplied in part). Under this test, we believe, it is reasonably clear that the plaintiff publishers have succeeded in negating fair use.

As noted above, most of the copyshops that compete with MDS in the sale of coursepacks pay permission fees for the privilege of duplicating and selling excerpts from copyrighted works. The three plaintiffs together have been collecting permission fees at a rate approaching $500,000 a year. If copyshops across the nation were to start doing what the defendants have been doing here, this revenue stream would shrivel and the potential value of the copyrighted works of scholarship published by the plaintiffs would be diminished accordingly.

The defendants contend that it is circular to assume that a copyright holder is entitled to permission fees and then to measure market loss by reference to the lost fees. They argue that market harm can only be measured by lost sales of books, not permission fees. But the circularity argument proves too much. Imagine that the defendants set up a printing press and made exact reproductions—asserting that such reproductions constituted "fair use"—of a book to which they did not hold the copyright. Under the defendants' logic it would be circular for the copyright holder to argue market harm because of lost copyright revenues, since this would assume that the copyright holder had a right to such revenues.

A "circularity" argument indistinguishable from that made by the defendants here was rejected by the Second Circuit in *American Geophysical,* 60 F.3d at 929–31 (Jon O. Newman, C.J.), where the photocopying of scientific articles for use by Texaco researchers was held to be an unfair use. It is true, the

Second Circuit acknowledged, that "a copyright holder can *always* assert some degree of adverse [e]ffect on its potential licensing revenues as a consequence of [the defendant's use] ... simply because the copyright holder has not been paid a fee to permit that particular use." *Id.* at 929 n. 17. But such an assertion will not carry much weight if the defendant has "filled a market niche that the [copyright owner] simply had no interest in occupying." *Id.* at 930 (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1377 (2d Cir.1993)). Where, on the other hand, the copyright holder clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so—"it is appropriate that potential licensing revenues for photocopying be considered in a fair use analysis." *American Geophysical,* 60 F.3d at 930. Only "traditional, reasonable, or likely to be developed markets" are to be considered in this connection, and even the availability of an existing system for collecting licensing fees will not be conclusive. *Id.* at 930–31.[4] But Congress has implicitly suggested that licensing fees should be recognized in appropriate cases as part of the potential market for or value of the copyrighted work, and it was primarily because of lost licensing revenue that the Second Circuit agreed with the finding of the district court in *American Geophysical* that "the publishers have demonstrated a substantial harm to the value of their copyrights through [Texaco's] copying." *Id.* at 931 (quoting the district court opinion (Pierre N. Leval, J.) reported at 802 F.Supp. 1, 21 (S.D.N.Y.1992)).

The approach followed by Judges Newman and Leval in the *American Geophysical* litigation is fully consistent with the Supreme Court case law. In *Harper & Row,* where there is no indication in the opinion that the challenged use caused any diminution in sales of President Ford's memoirs, the Court found harm to the market for the licensing of

---

4. Although not conclusive, the existence of an established license fee system is highly relevant: "[I]t is sensible that a particular unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an unauthorized use should

be considered 'less fair' when there is a ready market or means to pay for the use. The vice of circular reasoning arises only if the availability of payment is conclusive against fair use." *Id.* at 931.

excerpts. The Court's reasoning—which was obviously premised on the assumption that the copyright holder was entitled to licensing fees for use of its copyrighted materials—is no more circular than that employed here. And in *Campbell,* where the Court was unwilling to conclude that the plaintiff had lost licensing revenues under the fourth statutory factor, the Court reasoned that a market for critical parody was not one "that creators of original works would in general develop or license others to develop." *Campbell,* 510 U.S. at 592, 114 S.Ct. at 1178.

The potential uses of the copyrighted works at issue in the case before us clearly include the selling of permission to reproduce portions of the works for inclusion in coursepacks—and the likelihood that publishers actually will license such reproduction is a demonstrated fact. A licensing market already exists here, as it did not in a case on which the plaintiffs rely, *Williams & Wilkins Co. v. United States,* 203 Ct.Cl. 74, 487 F.2d 1345 (1973), *aff'd by an equally divided Court,* 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975). Thus there is no circularity in saying, as we do say, that the potential for destruction of this market by widespread circumvention of the plaintiffs' permission fee system is enough, under the *Harper & Row* test, "to negate fair use."

Our final point with regard to the fourth statutory factor concerns the affidavits of the three professors who assigned one or more of the copyrighted works to be read by their students. The defendants make much of the proposition that these professors only assigned excerpts when they would not have required their students to purchase the entire work. But what seems significant to us is that none of these affidavits shows that the professor executing the affidavit would have refrained from assigning the copyrighted work if the position taken by the copyright holder had been sustained beforehand.

It is true that Professor Victor Lieberman, who assigned the excerpt from the Olson and Roberts book on America and Vietnam, raises questions about the workability of the permission systems of "many publishers." In 1991, Professor Lieberman avers, a Kinko's copyshop to which he had given materials for inclusion in a coursepack experienced serious delays in obtaining permissions from unnamed publishers. Professor Lieberman does not say that timely permission could not have been obtained from the publisher of the Olson and Roberts book, however, and he does not say that he would have refrained from assigning the work if the copyshop had been required to pay a permission fee for it.

It is also true that the publisher of one of the copyrighted works in question here (*Public Opinion,* by Walter Lippmann) would have turned down a request for permission to copy the 45–page excerpt included in a coursepack prepared to the specifications of Professor Donald Kinder. The excerpt was so large that the publisher would have preferred that students buy the book itself, and the work was available in an inexpensive paperback edition. But Professor Kinder does not say that he would have refrained from assigning the excerpt from the Lippmann book if it could not have been included in the coursepack. Neither does he say that he would have refrained from assigning any of the other works mentioned in his affidavit had he known that the defendants would be required to pay permission fees for them.

The third professor, Michael Dawson, assigned a 95–page excerpt from the book on black politics by Nancy Weiss. Professor Dawson does not say that a license was not available from the publisher of the Weiss book, and he does not say that the license fee would have deterred him from assigning the book.

### III

In the context of nontransformative uses, at least, and except insofar as they touch on the fourth factor, the other statutory factors seem considerably less important. We shall deal with them relatively briefly.

### A

As to "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," 17 U.S.C. § 107(1), we have already explained our reasons for con-

cluding that the challenged use is of a commercial nature.

The defendants argue that the copying at issue here would be considered "nonprofit educational" if done by the students or professors themselves. The defendants also note that they can profitably produce multiple copies for less than it would cost the professors or the students to make the same number of copies. Most of the copyshops with which the defendants compete have been paying permission fees, however, and we assume that these shops too can perform the copying on a more cost-effective basis than the professors or students can. This strikes us as a more significant datum than the ability of a black market copyshop to beat the do-it-yourself cost.

As to the proposition that it would be fair use for the students or professors to make their own copies, the issue is by no means free from doubt. We need not decide this question, however, for the fact is that the copying complained of here was performed on a profit-making basis by a commercial enterprise. And "[t]he courts have ... properly rejected attempts by for-profit users to stand in the shoes of their customers making nonprofit or noncommercial uses." Patry, *Fair Use in Copyright Law*, at 420 n. 34. As the House Judiciary Committee stated in its report on the 1976 legislation,

> "[I]t would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself." H.R.Rep. No. 1476, 94th Cong., 2d Sess. at 74 (1976), U.S.Code Cong. & Admin.News 5659, 5687-88.

It should be noted, finally, that the degree to which the challenged use has transformed the original copyrighted works—another element in the first statutory factor—is virtually indiscernible. If you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very much—even if you juxtapose them to excerpts from other works and package everything conveniently. This kind of mechanical "transformation"

bears little resemblance to the creative metamorphosis accomplished by the parodists in the *Campbell* case.

## B

The second statutory factor, "the nature of the copyrighted work," is not in dispute here. The defendants acknowledge that the excerpts copied for the coursepacks contained creative material, or "expression;" it was certainly not telephone book listings that the defendants were reproducing. This factor too cuts against a finding of fair use.

## C

The third statutory factor requires us to assess "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." Generally speaking, at least, "the larger the volume (or the greater the importance) of what is taken, the greater the affront to the interests of the copyright owner, and the less likely that a taking will qualify as a fair use." Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1122 (1990).

The amounts used in the case at bar— 8,000 words in the shortest excerpt—far exceed the 1,000–word safe harbor that we shall discuss in the next part of this opinion. See H.R.Rep. No. 1476, 94th Cong., 2d Sess. (1976), reprinted after 17 U.S.C.A. § 107. The defendants were using as much as 30 percent of one copyrighted work, and in no case did they use less than 5 percent of the copyrighted work as a whole. These percentages are not insubstantial. And to the extent that the third factor requires some type of assessment of the "value" of the excerpted material in relation to the entire work, the fact that the professors thought the excerpts sufficiently important to make them required reading strikes us as fairly convincing "evidence of the qualitative value of the copied material." *Harper & Row*, 471 U.S. at 565, 105 S.Ct. at 2233. We have no reason to suppose that in choosing the excerpts to be copied, the professors passed over material that was more representative of the major ideas of the work as a whole in

preference to material that was less representative.

The third factor may have more significance for the 95–page excerpt from the black politics book than for the 17–page excerpt from the Vietnam book. In each instance, however, the defendants have failed to carry their burden of proof with respect to "amount and substantiality." [5]

## IV

■ We turn now to the pertinent legislative history. The general revision of the copyright law enacted in 1976 was developed through a somewhat unusual process. Congress and the Register of Copyrights initiated and supervised negotiations among interested groups—groups that included authors, publishers, and educators—over specific legislative language. Most of the language that emerged was enacted into law or was made a part of the committee reports. See Jessica Litman, *Copyright, Compromise, and Legislative History,* 72 CORNELL L. REV. 857 (1987). The statutory fair use provisions are a direct result of this process. *Id.* at 876–77. So too is the "Agreement on Guidelines for Classroom Copying in Not–for–Profit Educational Institutions With Respect to Books and Periodicals"—commonly called the "Classroom Guidelines"—set out in H.R.Rep. No. 1476 at 68–71, 94th Cong., 2d Sess. (1976). The House and Senate conferees explicitly accepted the Classroom Guidelines "as part of their understanding of fair use," H.R. Conf. Rep. No. 1733, 94th Cong.2d Sess. at 70 (1976), and the Second Circuit has characterized the guidelines as "persuasive authority...." *American Geophysical,* 60 F.3d at 919 n. 5, citing *Kinko's,* 758 F.Supp. at 1522–36.

There are strong reasons to consider this legislative history. The statutory factors are not models of clarity, and the fair use issue has long been a particularly troublesome one. See *Acuff–Rose Music, Inc. v. Campbell,* 972 F.2d 1429, 1439 (6th Cir.1992) (Nelson, J., dissenting), *rev'd,* 510 U.S. 569, 114 S.Ct.

1164, 127 L.Ed.2d 500 (1994). Not surprisingly, courts have often turned to the legislative history when considering fair use questions. See *Harper & Row,* 471 U.S. at 549–53, 105 S.Ct. at 2225–27, where the Supreme Court looked not only to the House report cited above, but to an earlier Senate report "discussing fair use of photocopied materials in the classroom...." And see *Campbell,* 510 U.S. at 574–78, 114 S.Ct. at 1170, where the Court likewise sifted through the congressional committee reports.

Although the Classroom Guidelines purport to "state the minimum and not the maximum standards of educational fair use," they do evoke a general idea, at least, of the type of educational copying Congress had in mind. The guidelines allow multiple copies for classroom use provided that (1) the copying meets the test of brevity (1,000 words, in the present context); (2) the copying meets the test of spontaneity, under which "[t]he inspiration and decision to use the work and the moment of its use for maximum teaching effectiveness [must be] so close in time that it would be unreasonable to expect a timely reply to a request for permission;" (3) no more than nine instances of multiple copying take place during a term, and only a limited number of copies are made from the works of any one author or from any one collective work; (4) each copy contains a notice of copyright; (5) the copying does not substitute for the purchase of "books, publishers' reprints or periodicals;" and (6) the student is not charged any more than the actual cost of copying. The Classroom Guidelines also make clear that unauthorized copying to create "anthologies, compilations or collective works" is prohibited. H.R.Rep. No. 1476 at 69.

In its systematic and premeditated character, its magnitude, its anthological content, and its commercial motivation, the copying done by MDS goes well beyond anything envisioned by the Congress that chose to incorporate the guidelines in the legislative history. Although the guidelines do not pur-

---

5. "Fair use serves as an affirmative defense to a claim of copyright infringement, and thus the party claiming that its secondary use of the original copyrighted work constitutes a fair use typi-

cally carries the burden of proof as to all issues in the dispute." *American Geophysical,* 60 F.3d at 918, citing *Campbell,* 510 U.S. at 589–91, 114 S.Ct. at 1177.

port to be a complete and definitive statement of fair use law for educational copying, and although they do not have the force of law, they do provide us general guidance. The fact that the MDS copying is light years away from the safe harbor of the guidelines weighs against a finding of fair use.

Although the Congress that passed the Copyright Act in 1976 would pretty clearly have thought it unfair for a commercial copyshop to appropriate as much as 30 percent of a copyrighted work without paying the license fee demanded by the copyright holder, the changes in technology and teaching practices that have occurred over the last two decades might conceivably make Congress more sympathetic to the defendants' position today. If the law on this point is to be changed, however, we think the change should be made by Congress and not by the courts.

## V

We take as our text for the concluding part of this discussion of fair use Justice Stewart's well-known exposition of the correct approach to "ambiguities" (see *Sony*, 464 U.S. at 431–32, 104 S.Ct. at 783–84) in the copyright law:

> "The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good. 'The sole interest of the United States and the primary object in conferring the monopoly,' this Court has said, 'lie in the general benefits derived by the public from the labors of authors.' ... When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975) (footnotes and citations omitted).

The defendants attach considerable weight to the assertions of numerous academic authors that they do not write primarily for money and that they want their published writings to be freely copyable. The defendants suggest that unlicensed copying will "stimulate artistic creativity for the general public good."

This suggestion would be more persuasive if the record did not demonstrate that licensing income is significant to the publishers. It is the publishers who hold the copyrights, of course—and the publishers obviously need economic incentives to publish scholarly works, even if the scholars do not need direct economic incentives to write such works.

The writings of most academic authors, it seems fair to say, lack the general appeal of works by a Walter Lippmann, for example. (Lippmann is the only non-academic author whose writings are involved in this case.) One suspects that the profitability of at least some of the other books at issue here is marginal. If publishers cannot look forward to receiving permission fees, why should they continue publishing marginally profitable books at all? And how will artistic creativity be stimulated if the diminution of economic incentives for publishers to publish academic works means that fewer academic works will be published?

The fact that a liberal photocopying policy may be favored by many academics who are not themselves in the publishing business has little relevance in this connection. As Judge Leval observed in *American Geophysical*,

> "It is not surprising that authors favor liberal photocopying; generally such authors have a far greater interest in the wide dissemination of their work than in royalties—all the more so when they have assigned their royalties to the publisher. But the authors have not risked their capital to achieve dissemination. The publishers have. Once an author has assigned her copyright, her approval or disapproval of photocopying is of no further relevance." 802 F.Supp. at 27.

In the case at bar the district court was not persuaded that the creation of new works of scholarship would be stimulated by depriving publishers of the revenue stream derived from the sale of permissions. Neither are we. On the contrary, it seems to us, the destruction of this revenue stream can only have a deleterious effect upon the incentive to publish academic writings.

## VI

The district court's conclusion that the infringement was willful is somewhat more problematic, in our view. The Copyright Act allows the collection of statutory damages of between $500 and $20,000 for each work infringed. 17 U.S.C. § 504(c)(1). Where the copyright holder establishes that the infringement is willful, the court may increase the award to not more than $100,-000. 17 U.S.C. § 504(c)(2). If the court finds that the infringement was innocent, on the other hand, the court may reduce the damages to not less than $200. *Id.* Here the district court · awarded $5,000 per work infringed, characterizing the amount of the award as "a strong admonition from this court." 855 F.Supp. at 913.

Willfulness, under this statutory scheme, has a rather specialized meaning. As Professor Nimmer explains,

"In other contexts ['willfulness'] might simply mean an intent to copy, without necessarily an intent to infringe. It seems clear that as here used, 'willfully' means with knowledge that the defendant's conduct constitutes copyright infringement. · Otherwise, there would be no point in providing specially for the reduction of minimum awards in the case of innocent infringement, because any infringement that was nonwillful would necessarily be innocent. This seems to mean, then, that one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes." Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 14.04[B][3] (1996).

The plaintiffs do not contest the good faith of Mr. Smith's belief that his conduct constituted fair use; only the reasonableness of that belief is challenged. "Reasonableness," in the present context, is essentially a question of law. The facts of the instant case are not in dispute, and the issue is whether the copyright law supported the plaintiffs' position so clearly that the defendants must be deemed as a matter of law to have exhibited a reckless disregard of the plaintiffs' property rights. We review this issue *de novo.*

Fair use is one of the most unsettled areas of the law. The doctrine has been said to be "so flexible as virtually to defy definition." *Time Inc. v. Bernard Geis Assoc.,* 293 F.Supp. 130, 144 (S.D.N.Y.1968). The potential for reasonable disagreement here is illustrated by the forcefully argued dissents and the now-vacated panel opinion. In the circumstances of this case, we cannot say that the defendants' belief that their copying constituted fair use was so unreasonable as to bespeak willfulness. Accordingly, we shall remand the case for reconsideration of the statutory damages to be awarded.

## VII

Insofar as injunctive relief is concerned, the judgment of the district court has not been set forth on a separate document in the manner required by Rule 58, Fed. R.Civ.P. The penultimate sentence of the concluding paragraph of the district court's order—a sentence evidently intended to serve the office of a separate injunction— reads as follows:

"Further, defendants are ENJOINED from copying any of plaintiffs' existing or future copyrighted works without first obtaining the necessary permission." 855 F.Supp. at 913.

The district court clearly did not intend to prohibit the defendants from copying without permission works not protected by copyright. We are uncertain whether the district court gave any consideration to copying of a sort that could not be anything other than fair use. On remand the district court should set forth its judgment in a separate document stating the scope of the injunction more precisely. ·

Before the initial panel that heard this case—but not before the *en banc* court—the defendants argued that the district court exceeded its powers by enjoining them from reproduction of future copyrighted works. We do not find the argument persuasive. The weight of authority supports the extension of injunctive relief to future works. See, *e.g., Olan Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345 (8th Cir.1994); *Pacific and Southern Co., Inc. v. Duncan,* 744 F.2d 1490 (11th

Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985); *Basic Books,* 758 F.Supp. at 1542; Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 1406[B] (1995). The view taken by these authorities seems the better one to us.

## VIII

The grant of summary judgment on the fair use issue is **AFFIRMED.** The award of damages is **VACATED,** and the case is **REMANDED** for reconsideration of damages and for entry of a separate judgment not inconsistent with this opinion.

BOYCE F. MARTIN, Jr., Chief Judge, dissenting.

This case presents for me one of the more obvious examples of how laudable societal objectives, recognized by both the Constitution and statute, have been thwarted by a decided lack of judicial prudence. Copyright protection as embodied in the Copyright Act of 1976 is intended as a public service to both the creator and the consumer of published works. Although the Act grants to individuals limited control over their original works, it was drafted to stimulate the production of those original works for the benefit of the whole nation. The fair use doctrine, which requires unlimited public access to published works in educational settings, is one of the essential checks on the otherwise exclusive property rights given to copyright holders under the Copyright Act.

Ironically, the majority's rigid statutory construction of the Copyright Act grants publishers the kind of power that Article I, Section 8 of the Constitution is designed to guard against. The Copyright Clause grants Congress the power to create copyright interests that are *limited* in scope. Consequently, the Copyright Act adopted the fair use doctrine to protect society's vested interest in the sharing of ideas and information against pursuits of illegitimate or excessive private proprietary claims. While it may seem unjust that publishers must share, in certain situations, their work-product with others, free of charge, that is not some "unforeseen byproduct of a statutory scheme;" rather, it is the "essence of copyright" and a

"constitutional requirement." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 349, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991).

Michigan Document Services provided a service to the University of Michigan that promoted scholarship and higher education. Michigan Document Services was paid for its services; however, that fact does not obviate a fair use claim under these facts. Requiring Michigan Document Services to pay permission fees in this instance is inconsistent with the primary mission of the Copyright Act. The individual rights granted by the Act are subservient to the Act's primary objective, which is the promotion of creativity generally. We must therefore consider the fair use provision of Section 107 of the Act in light of the sum total of public benefits intended by copyright law. In this instance, there is no adverse economic impact on Princeton University Press that can outweigh the benefits provided by Michigan Document Services. Indeed, to presume adverse economic impact, as has the majority, is to presume that the $50,000 in fees currently earned by plaintiff is mandated by the Act in every instance— something I hesitate to presume.

That the majority lends significance to the identity of the person operating the photocopier is a profound indication that its approach is misguided. Given the focus of the Copyright Act, the only practical difference between this case and that of a student making his or her own copies is that commercial photocopying is faster and more cost-effective. Censuring incidental private sector profit reflects little of the essence of copyright law. Would the majority require permission fees of the Professor's teaching assistant who at times must copy, at the Professor's behest, copyrighted materials for dissemination to a class, merely because such assistant is paid an hourly wage by the Professor for this work?

The majority's strict reading of the fair use doctrine promises to hinder scholastic progress nationwide. By charging permission fees on this kind of job, publishers will pass on expenses to colleges and universities that will, of course, pass such fees on to

students. Students may also be harmed if added expenses and delays cause professors to opt against creating such specialized anthologies for their courses. Even if professors attempt to reproduce the benefits of such a customized education, the added textbook cost to students is likely to be prohibitive.

The Copyright Act does not suggest such a result. Rather, the fair use doctrine contemplates the creation and free flow of information; the unhindered flow of such information through, among other things, education in turn spawns the creation and free flow of new information.

In limiting the right to copy published works in the Copyright Act, Congress created an exception for cases like the one before us. When I was in school, you bought your books and you went to the library for supplemental information. To record this supplemental information, in order to learn and benefit from it, you wrote it out long-hand or typed out what you needed—not easy, but effective. Today, with the help of free enterprise and technology, this fundamental means of obtaining information for study has been made easier. Students may now routinely acquire inexpensive copies of the information they need without all of the hassle. The trend of an instructor giving information to a copying service to make a single set of copies for each student for a small fee is just a modern approach to the classic process of education. To otherwise enforce this statute is nonsensical. I therefore dissent.

MERRITT, Circuit Judge, dissenting.

The copying done in this case is permissible under the plain language of the copyright statute that allows "multiple copies for classroom use:" "[T]he fair use of a copyrighted work ... for purposes such as ... teaching (*including multiple copies for classroom*

*use*), ... is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). Also, the injunction the Court has upheld exceeds the protections provided by the Copyright Act of 1976 regardless of whether the use was a fair use and is so grossly overbroad that it violates the First Amendment.

### I.

This is a case of first impression with broad consequences. Neither the Supreme Court nor any other court of appeals has interpreted the exception allowing "multiple copies for classroom use" found in § 107 of the copyright statute. There is no legal precedent and no legal history that supports our Court's reading of this phrase in a way that outlaws the widespread practice of copying for classroom use by teachers and students.

For academic institutions, the practical consequences of the Court's decision in this case are highly unsatisfactory, to say the least. Anyone who makes multiple copies for classroom use for a fee is guilty of copyright infringement unless the portion copied is just a few paragraphs long. Chapters from a book or articles from a journal are verboten. No longer may Kinko's and other corner copyshops, or school bookstores, libraries and student-run booths and kiosks copy anything for a fee except a small passage. I do not see why we should so construe plain statutory language that on its face permits "multiple copies for classroom use." The custom of making copies for classroom use for a fee began during my college and law school days forty years ago and is now well-established. I see no justification for overturning this long-established practice.

I disagree with the Court's method of analyzing and explaining the statutory language of § 107 providing a fair use exception.[1] Except for "teaching," the statute is cast in

---

1. Both the majority opinion and Judge Ryan's dissent approach the determination of whether the use at issue here is infringing solely by use of the four statutory factors set out in § 107. Neither the plain language of the statute nor the case law requires that determination to be made solely on the narrow grounds of those four factors. Because the plain language of the statute is clear concerning "multiple copies for classroom

use" and because determinations of infringement are to be made on a case-by-case basis taking into consideration the reasonableness of the copying from an equitable perspective, I do not believe that the four factors are controlling. The specific plain language should be given much more weight in this case than the four abstract considerations of little relevance to copying for classroom use.

general, abstract language that allows fair use for "criticism," "comment," "news reporting" and "research." The scope or extent of copying allowed for these uses is left undefined. Not so for "teaching." This purpose, and this purpose alone, is immediately followed by a definition. The definition allows "multiple copies for classroom use" of copyrighted material. The four factors to be considered, *e.g.*, market effect and the portion of the work used, are of limited assistance when the teaching use at issue fits squarely within the specific language of the statute, *i.e.*, "multiple copies for classroom use." In the present case that is all we have—"multiple copies for classroom use."

There is nothing in the statute that distinguishes between copies made for students by a third person who charges a fee for their labor and copies made by students themselves who pay a fee only for use of the copy machine. Our political economy generally encourages the division and specialization of labor. There is no reason why in this instance the law should discourage high schools, colleges, students and professors from hiring the labor of others to make their copies any more than there is a reason to discourage lawyers from hiring paralegals to make copies for clients and courts. The Court's distinction in this case based on the division of labor—who does the copying—is short sighted and unsound economically.

Our Court cites no authority for the proposition that the intervention of the copyshop changes the outcome of the case. The Court errs by focusing on the "use" of the materials made by the copyshop in making the copies rather than upon the real user of the materials—the students. Neither the District Court nor our Court provides a rationale as to why the copyshops cannot "stand in the shoes" of their customers in making copies for noncommercial, educational purposes where the copying would be fair use if undertaken by the professor or the student personally.

Rights of copyright owners are tempered by the rights of the public. The copyright owner has never been accorded complete control over all possible uses of a work. Generally, "[t]he monopoly privileges [of copyright] that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit," *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984), a statement the Court more fully explained as follows:

> The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.... When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of its basic purpose.

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2043–44, 45 L.Ed.2d 84 (1975) (footnotes omitted). The public has the right to make fair use of a copyrighted work and to exercise that right without requesting permission from, or paying any fee to, the copyright holder. The essence of copyright is the promotion of learning—not the enrichment of publishers.

## II.

Even if the plain language of the statute allowing "multiple copies for classroom use" were less clear, the Court's analysis of the fair use factors is off base. There is nothing in the fair use analysis that casts doubt on the plain meaning of "multiple copies for classroom use."

Money changes hands and makes the transaction "commercial" because the copyshop has freed the student from undertaking the physical task of copying. The copyshop makes its money based on the number of pages copied, not the content of those pages. The students paid the copyshop solely for the time, effort and materials that each student would otherwise have expended in copying the material himself or herself. The money paid is not money that would otherwise go to the publishers.

In finding the use to be "commercial," our Court cites as authority the use by the magazine The Nation of excerpts from President Ford's book, a use found to be infringement. Maj. Op. at 1385 (citing *Harper & Row, Pubs., Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). But the Ford excerpts were not copied from the original work on a photocopier and distributed to a political science class for study. They were not multiple copies for classroom use, copied "for the purposes . . . of teaching." They were "scooped" from the Ford memoirs and published in The Nation, a commercial publication, before Harper and Row, the copyright owner, could publish them. The case does not interpret the classroom use exception of § 107 and has no application to the case before us.

The statute also assesses the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." The excerpts here were a small percentage of the total work. The District Court recognized that the excerpts were "truly 'excerpts' and *do not purport to be replacements for the* original works." *Princeton Univ. Press v. Michigan Doc. Servs., Inc.*, 855 F.Supp. 905, 910 (E.D.Mich.1994). This factor does not weigh against a finding of fair use, and our Court errs in reaching a contrary conclusion.

The Court also errs in analyzing the market effect of the classroom copying. The Court erroneously shifts the burden of proof as to market effect to the defendant by labeling the use "commercial" in nature. Maj. op. at 1385. Generally the burden is on the plaintiff to demonstrate the alleged harm to the potential market value for the copyrighted work. If the challenge is to a noncommercial use of a copyrighted work, the plaintiff must prove by a preponderance of the evidence either that the particular use is harmful or that if it should become widespread, it would adversely affect the potential market for the copyrighted work. The Court shifts the burden because it fails to acknowledge that the use in question—making "multiple copies for classroom use" for "teaching" purposes—precisely fits the plain language of the § 107 exception. The Court strains to relieve the plaintiffs of their normal burden of proof.

Plaintiffs have met their burden only because the Court has lifted the burden and put it onto the shoulders of the defendant.

Turning to the effect of the use upon the potential market for or value of the copyrighted work, plaintiffs here have failed to demonstrate that the photocopying done by defendant has caused even marginal economic harm to their publishing business. As the Court concedes, the publishers would prefer that students purchase the publications containing the excerpts instead of receiving photocopies of excerpts from the publications. *See* Maj. op. at 1387 ("the publisher would have *preferred* that students buy the book itself . . . .") (emphasis added). What the publishers would "prefer" is not part of the analysis to determine the effect on the potential market. We are to examine what the facts tell us about the market effect. The facts demonstrate that it is only wishful thinking on the part of the publishers that the professors who assigned the works in question would have directed their students to purchase the entire work if the excerpted portions were unavailable for copying. The excerpts copied were a small percentage of the total work, and, as the professors testified, it seems more likely that they would have omitted the work altogether instead of requiring the students to purchase the entire work.

The use complained of by plaintiffs here has been widespread for many years and the publishers have not been able to demonstrate any significant harm to the market for the original works during that time. The publishing industry tried to persuade Congress in 1976 to ban the type of copying done by defendant here. Congress declined to do so and the publishing industry has been trying ever since to work around the language of the statute to expand its rights.

It is also wrong to measure the amount of economic harm to the publishers by loss of a presumed license fee—a criterion that assumes that the publishers have the right to collect such fees in all cases where the user copies any portion of published works. The majority opinion approves of this approach by affirming the issuance of an injunction prohibiting defendant from copying any por-

tion of plaintiffs' works. It does so without requiring a case-by-case determination of infringement as mandated by the Supreme Court. *See* discussion *infra* at 1385–86.

The publishers have no right to such a license fee. Simply because the publishers have managed to make licensing fees a significant source of income from copyshops and other users of their works does not make the income from the licensing a factor on which we must rely in our analysis. If the publishers have no right to the fee in many of the instances in which they are collecting it, we should not validate that practice by now using the income derived from it to justify further imposition of fees. Our job is simply to determine whether the use here falls within the § 107 exception for "multiple copies for classroom use." If it does, the publisher cannot look to us to force the copyshop to pay a fee for the copying.

The Court states that defendant has declined to pay "agreed royalties" to the holders of the copyrights. Maj. op. at 1385. Agreed to by whom? Defendant has not "agreed" to pay the publishers anything. It is fair to label a royalty as "agreed to" only when the publisher has appropriately negotiated a fee with the copyshop for use of the copy in question.

### III.

The injunction upheld by the Court, as it stands now, extends the rights of the copyright owners far beyond the limits prescribed by Congress.[2] It prohibits defendant from copying any excerpts from plaintiffs' materials, both those now in existence and any that may be published by plaintiffs in the future, regardless of whether the entire work is appropriately protected by copyright or whether the copying is for classroom use or is otherwise a fair use. The injunction prohibits defendant from copying from copyrighted works of the plaintiffs, without regard to length, content or purpose of the copying and without any recognition that the

doctrine of fair use exists. The injunction avoids the necessity of determining whether the copying is an infringement or a fair use—any copying and dissemination is forbidden. The injunction also protects future publications of plaintiffs—works that have not yet even been created—without any knowledge as to the level of copyright protection the works would normally be afforded.

The gross overbreadth of the injunction appears to violate the First Amendment. The purpose of the First Amendment is to facilitate the widest possible dissemination of information. "From a first amendment viewpoint, the effect of an injunction is to restrain the infringing expression altogether—an effect which goes beyond what is necessary to secure the copyright property." Goldstein, Copyright and the First Amendment, 70 Colum. L.Rev. 983, 1030 (1970); *see also New Era Pubs. Int'l, ApS v. Henry Holt and Co.,* 873 F.2d 576, 595–97 (2d Cir.1989) (Oakes, J., concurring), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (discussing tension between First Amendment and injunctions in copyright cases); 3 Nimmer § 14.06[B] at 14–56.2 (where public harm would result from the injunction, courts should award damages in lieu of injunction).

In sum, the injunction imposed here—an injunction that provides blanket copyright protection for all the works of a given publisher without regard to the limitations on copyright protection—is overbroad. The injunction is inappropriate because it prohibits the public from using defendant's copyshop for noninfringing copying of plaintiffs' works.

RYAN, Circuit Judge, dissenting.

It is clear from the application of the four fair use factors of 17 U.S.C. § 107 that MDS's copying of the publishers' copyrighted works in this case is fair use and, thus, no infringement of the publishers' rights. Indeed, it is a use which is merely an aspect of the professors' and students' classroom use, and, only in the narrowest and most technical

---

**2.** Although the majority has modified its original draft of the opinion to order a remand directing the district court (1) to set out the injunction in a separate order as required by Federal Rule of Civil Procedure 65 and (2) to set forth "more precisely" the scope of the injunction, the remand instruction gives virtually no guidance to the district court about curing the overbreadth of the injunction.

sense, a use of a separate genre under section 107. And, so, I must dissent from the majority's contrary view and, in expressing my understanding of the matter, I shall identify three important subissues on which I think my colleagues' analysis has led them to mistakenly conclude that MDS's activity is not a fair use of the publishers' materials.

In my judgment, my colleagues have erred in

1. focusing on the loss of permission fees in evaluating "market effect" under section 107(4);
2. finding that the evidence supports the conclusion that permission fees provide an important incentive to authors to create new works or to publishers to publish new works; and
3. using legislative history, specifically the "Classroom Guidelines," to decide the issue of classroom use.

## I.

Professors may make the judgment that only fractional portions of much larger copyrighted works need to be examined by their students to explain the theories, facts, and historical developments in which the professors are interested, or that the selected excerpted materials are not central to the professors' classroom purpose. In such an instance, the professors may conclude that the educational benefit to the students does not justify requiring the students to purchase the entire original work. Rather than omit the materials entirely, the professors could, of course, make a reference copy of the excerpted portions and produce multiple copies of the relevant sections for their students. Alternatively, they might require their students to spend their own time going to the library, waiting their turn to gain access to sometimes scarce library reserve materials, going to the coin operated photocopying machines, and making their own copies, a practice that the publishers have not challenged. However, in the circumstances of this case, the professors, presumably as a service to the students, requested MDS to copy and assemble from a number of works excerpts identified by the professors as beneficial for their students to read.

MDS apparently produces better copies and at less cost than individual professors or students could.

The professors select the materials to be copied and deliver them to MDS with an estimate of the number of students expected in the course. The professors then assign the material to students enrolled in a particular class and inform them that they may purchase the required materials in coursepack form at MDS if they wish to do so. In the alternative, students are free to make copies of the excerpted material at the library themselves, to copy the material from other students, or to purchase the whole of the original work in which the assigned text appears.

MDS prepares a master copy of all the materials selected by the professor, creates a table of contents, identifies excerpts by author and name of the underlying work, numbers the pages, and then binds the copied excerpts together. These coursepacks are sold only to students for use in a particular course; they are not sold to the general public. Any copies that are not purchased are simply discarded. The coursepacks are priced on a per-page basis, regardless of the contents of the page. The fee for a page reproducing copyrighted materials is the same as the fee for a blank page. The professors receive no commissions or other economic benefit from delivering coursepack materials to MDS.

We are specifically concerned in this case with six excerpts extracted from works to which plaintiffs hold the copyrights. Following the direction of several professors who brought the excerpts to the defendants for copying, MDS assembled the excerpts, along with other materials not at issue in this suit, into three coursepacks. The excerpts copied ranged from 17 to 95 pages, or 5% to 30%, of the original works. Each of the requesting professors signed a declaration stating that he does not request copies of excerpts where he would otherwise have assigned the entire work to his students.

Each of the plaintiff publishers operates a department that receives and processes requests for permission to use any of that

publisher's copyrighted works. The plaintiff publishers usually charge a fee for allowing others to copy portions of their works and generally share these fees with the authors. Sometimes the publishers grant permission to copy without charge, and other times they deny permission entirely.

## II.

The Copyright Act both establishes a general grant of monopoly powers to holders of copyrights and codifies the "fair use" doctrine as an exception to that broad grant. Section 106 of the Copyright Act confers exclusive rights upon individual creators to distribute and produce their original copyrighted work and "derivative works based upon the copyrighted work." 17 U.S.C. § 106. However, section 107 carves out an exception to the exclusive rights conferred in section 106, permitting members of the public to use copyrighted works for "fair" purposes. 17 U.S.C. § 107. Whether a challenged use qualifies as a "fair use" is to be determined by considering section 107's four fair use factors, which are set forth in the majority opinion, as well as any other relevant considerations. The four fair use factors, and any other relevant factors, must be applied and weighed together "in light of the purposes of copyright" protection. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578, 114 S.Ct. 1164, 1171, 127 L.Ed.2d 500 (1994) (citing Pierre N. Leval, *Toward a Fair Use Standard,* 103 HARV. L. REV. 1104, 1110–11 (1990)).

"The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 349, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991) (quoting U.S. CONST. art. I, § 8, cl. 8). This court has explained:

> Copyrights provide an incentive for the creation of works by protecting the owner's use of his or her intellectual creation, allowing creators to reap the material rewards of their efforts. However, because not every use of a work undermines this underlying rationale of copyright law, and because some uses of copyrighted works

are desirable for policy reasons, the courts have long held that many uses of a copyrighted work do not infringe upon the copyright.

*National Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio,* 15 F.3d 559, 561 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 71, 130 L.Ed.2d 26 (1994). Although monopoly protection of the financial interests of inventors and authors is sometimes necessary "to stimulate creativity and authorship, excessively broad protection would stifle, rather than advance," intellectual progress. Leval, *supra,* at 1109. For progress in "Science and useful Arts" to occur, others must be permitted to build upon and refer to the creations of prior thinkers.

Thus, the "fair use" concept embodied in section 107 may be understood generally to permit a secondary use that "serves the copyright objective of stimulating productive thought and public instruction without excessively diminishing the incentives for creativity." Leval, *supra,* at 1110. An evaluation of fair use therefore "involves a difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984). Although section 107 mentions "teaching" and "multiple copies for classroom use" as possible fair uses, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement." *Campbell,* 510 U.S. at 584, 114 S.Ct. at 1174. Thus, I agree with the majority that the production and use of the coursepacks must be examined under all four factors enumerated in section 107.

### III.

#### A.

At the very outset, it is critical to understand, as I have earlier stated, that MDS's "use" of this copyrighted material is of the same essential character as "use" by a student who chooses to personally make a pho-

tocopy of the designated excerpts. There are two differences: 1) the student will further "use" the material in the classroom; and 2) MDS does the copying for the student for a profit.

The question that must ultimately be answered is whether that which is a fair use for a student—copying—is not a fair use if done for the student by another, and for a profit.

Plainly, the Copyright Act explicitly anticipates that use of a work by "reproduction in copies . . . for purposes such as . . . teaching (including multiple copies for classroom use)," will sometimes be a fair use even though teaching is commonly conducted for profit. 17 U.S.C. § 107.

Thus, MDS's copying of materials, which indisputably are for "teaching (including multiple copies for classroom use)," must be tested for fair use under the four "factors to be considered" in section 107. *Id.*

The first factor that courts must evaluate in a fair use determination is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

There are two parts to section 107's first factor: (1) the degree to which the challenged use has transformed the original, and (2) the profit or nonprofit character of the use. Both a non-transformative use determination and a "commercial" use determination weigh against a finding of fair use, though by no means conclusively.

The "purpose and character of the use" is examined to determine whether the questioned use would tend to advance or to thwart the goals of copyright law. The inquiry into the *transformative* aspect of the use assesses the likely benefit to society from the use—the more the original work has been transformed, the more likely it is that a distinct and valuable new product has been created. The inquiry into the profit or nonprofit aspect of the use assesses both the likely benefit to society and the likelihood that the use will threaten the creators' incentives. Users with purely financial purposes are more likely to use the work for personal gain rather than other, socially laudable goals, and are more likely to be capturing the same economic rewards that motivated the creators of the original work. Thus, the ultimate inquiry under the first fair use factor is whether the type of use being challenged is, by its nature, likely to benefit society without excessively diminishing the incentives to create new works.

#### i.

Ordinarily, analysis of transformative character under the first prong of the first factor centers on "whether the new work merely 'supersede[s]' the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579, 114 S.Ct. at 1171 (citations omitted). But in this case there is no occasion to address the transformative aspect because that inquiry is not conducted at all in the case of multiple copies for classroom use. The Supreme Court has noted in *dicta* that "[t]he obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom distribution." *Campbell*, 510 U.S. at 579 n. 11, 114 S.Ct. at 1171 n. 11. Thus, although the transformative value of the coursepacks is slight, it does not in any respect weigh against MDS's reproduction of excerpts for classroom use.

#### ii.

The second prong of the first fair use factor asks whether the purpose of the *use* is commercial or nonprofit and educational. *Id.* at 583, 114 S.Ct. at 1174. The "fact that a publication [is] commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). The point here "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Id.* In my judgment, a party profits

from "exploiting copyrighted material" when it assesses the marketable potential of copyrighted material, selects material based on its content in order to reproduce those portions that will attract customers, and therefore profits from the *substance* of the copyrighted work.

As a preliminary matter, we must first decide whose *use* of the coursepacks must be evaluated. The majority accepts the publishers' position that the only relevant "use" under the first factor is MDS's sale of the coursepacks to students, not the use of the purchased coursepacks by the professors and students. Having limited its inquiry to MDS's mechanical reproduction of the excerpts and for-profit charge for the technology and labor required to reproduce the relevant pages, the majority easily finds that the copyshop's "use" of the copyrighted works is "commercial." I do not find support for this abbreviated analysis in either the statutory text or the case law.

Certainly nothing in the language of the statute supports the majority's decision to analyze the copyshop's production of multiple copies of the excerpts as a "use" completely independent from the classroom use of those copies. MDS, considered apart from the professors and students, does not "use" the "copyrighted work" in the sense primarily addressed in section 107; it uses a "master copy" of the excerpted material delivered to it by the professor, copy paper, ink, photocopying machines, mechanical binders, and related production materials to make the number of copies the professor has ordered. MDS could not care less whether Professor X asks it to copy selections from Walter Lippmann's *Public Opinion* or the 1996 University of Michigan Varsity Football roster. Either material is copied at a few cents a page, and MDS does not "use" the information from either—at least, not in the sense plainly contemplated by Congress in any of the language of section 107.

If the words used in section 107 are to be given their primary and generally accepted meaning, particularly in the context of the balance of the Copyright Act, it is obvious that the use that is to be evaluated for fairness in this case is the use to which the

protected *substantive* text is put, not the mechanical process of copying it. Congress specifically identified "*teaching* (including *multiple copies* for classroom use)," § 107 (emphasis added), as an illustration of a possible fair use. Consequently, the act of copying (implicit in "multiple copies") is *within* the illustrative use of "teaching." MDS is not in the business of making copies of protected work in order to fill up warehouses or please the logging industry; it makes the copies *only* for classroom use. Neither the language of section 107 nor simple common sense warrant examining the production of multiple copies in a vacuum and ignoring their educational use on the facts of this case.

The majority claims that the Supreme Court's reasoning in *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985), supports its decision to ignore the professors' and students' use of the coursepacks and focus exclusively on MDS's use. The difficulty with this approach is that the two situations are not parallel. In *Harper & Row,* the copyright holder of President Ford's unpublished memoirs sold the right to publish the first excerpts of the unpublished work to *Time Magazine.* Before *Time Magazine* could publish the excerpts, a competitor, *The Nation Magazine,* obtained an illicit copy of the manuscript and published a short article directly quoting some of President Ford's juiciest revelations. *The Nation Magazine,* in which the challenged article appeared, was, of course, sold to the general public. *Time Magazine* refused to fulfill its contract to pay the copyright holder for the right to use the memoirs since its "exclusive" right of "first publication" had already been "scooped." The majority opinion declares: "Like the students who purchased unauthorized coursepacks, the purchasers of The Nation did not put the contents of the magazine to commercial use—but that did not stop the Supreme Court from characterizing [The Nation magazine's] use of excerpts as 'a publication [that] was commercial as opposed to nonprofit....'" Maj. op. at 1386 (citation omitted). The majority's intended parallel does not bear close scrutiny.

There are two critical facts that distinguish *Harper & Row* from this case. First, in *Harper & Row*, the profit-seeking entity that sold excerpts to the nonprofit users—the members of the general public who purchased the magazine and "used" the copied material to educate themselves—was the same entity that obtained the original manuscript and *selected* portions for reproduction. Thus, *The Nation Magazine* both directed the copying *and* profited from the copying. That is not this case. Here, a nonprofit entity (the professors) obtained the originals and selected portions for reproduction. The professors directed the copying but did not profit; MDS profited but did not direct what was to be copied. Second, in *Harper & Row*, the profit-seeking defendant, *The Nation Magazine*, carefully selected the material to be copied *for its content/substance* and sought to profit *from the content/substance* of the material that it reproduced, not from the mechanical service of reproduction itself. In this case, on the other hand, the profit-seeking defendant, MDS, neither selected the material to be copied for its content/substance nor sought to profit from the copyrighted material because of its substance; its purpose was to profit only from the mechanical services of photoreproduction and assembly.

With these distinctions in mind, I would approach the "commercial purpose" determination under section 107's first factor in a different way than the majority does. A use is "commercial" within the meaning of section 107 if the user seeks to profit from "exploiting" the copyrighted material. *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. *Profiting* from exploiting copyrighted material requires more than profit obtained from a mechanical service. Profiting from *exploiting* copyrighted material involves an active role in assessing the value of, selecting, and marketing copied material based on its substance. In *Harper & Row*, the defendant magazine assessed the value of President Ford's original work, selected the portions it believed to be the most "powerful," advertised, sold, and profited from the sale of the unauthorized copies, based on their substance. *Harper & Row* would be of some relevance to the market value component of

this case only if MDS were selecting excerpts by assessing their commercial value to the public, assembling coursepacks for its own purposes, and marketing the coursepacks to professors or to the public without paying for the copyrighted materials. But that is not what MDS does or did. MDS's *profit* is attributable entirely to its provision of a mechanical service—running materials of value to others and selected by others through its photocopying machines and binding them. Because MDS made no attempt to assess the value of what it copied and did not select the materials for its copying services, it did not "exploit the copyrighted material without paying the customary price," as that was done in the *Harper & Row* case.

Certainly it is true that MDS "uses" the copyright work in the sense that it copies the copyrighted material that is handed to it by the professors. But it does not "use" the material independent of the university professors' and students' use; it is a participant in their use and its profits are derived only from photoreproduction services the students pay it to perform.

The business of producing and selling coursepacks is more properly viewed as the commercial exploitation of professional copying technologies and of the inability of academic parties to reproduce printed materials efficiently, not the exploitation of copyrighted, creative materials. The copyshop is a printer, engaging *solely* in the business of reproducing images on paper at the direction of others. Because MDS does not control the length or substance of the excerpts that it copies, its profit motive does not provide information about the tendency of its activity to impinge upon the rightful territory of authors and does not interfere with the incentives orchestrated by the Copyright Act. The for-profit nature of MDS's service does not weigh against a finding of fair use because MDS, the for-profit actor, does not represent an institutional threat to authors and publishers' rightful profits.

The for-profit or nonprofit educational users whose purposes are linked to the authors' and publishers' incentives and therefore must be analyzed under this factor are

the professors and students. The professors and students clearly do *use* Lippmann's work. The professors use Lippmann's ideas in meeting their professional obligation to teach their students, and the students use Lippmann's ideas in their effort to master the concepts of the course to which Lippmann's ideas pertain. The professors and students' classroom use of the excerpts of copyrighted material appears to be non-profit. Although the professors and students are, in some sense, engaged in a for-profit endeavor—the professors teach for money and the students attend classes to obtain a commercially valuable degree—the purpose and character of the professors and students' use is not, on the facts of record in this case, "of a commercial nature." If "commerciality" meant only that the user employed the material while engaged in activity for profit, this one characteristic "would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" *Campbell,* 510 U.S. at 584, 114 S.Ct. at 1173 (quoting *Harper & Row,* 471 U.S. at 592, 105 S.Ct. at 2247). As I have said, the significant question in the first factor's inquiry into the purpose and character of the use is whether the copyrighted material is being *exploited* for profit without paying the customary price. The answer might well be affirmative if there were evidence that the professors were receiving commissions from the copyshop based on the number and length of coursepack orders that they placed; in such a case, the professors would be profiting from their decision to assign excerpts and would represent a commercially-motivated systemic threat to the authors and publishers' incentives to create new works.

An assessment of the distinction between for-profit activity and exploitation is critical because the Supreme Court has commanded that we examine "'the nature and *objects* of the *selections* made'" in view of "the examples given in the preamble to § 107" and the purposes of copyright protection—that is, to promote science and the arts. *Campbell,* 510 U.S. at 578, 114 S.Ct. at 1171 (emphasis added) (quoting *Folsom v. Marsh,* 9 F. Cas.

342, 348 (No. 4,901) (CCD Mass. 1841)). Additionally, in determining whether MDS's use is commercial, it is important to bear in mind the practical effect of such a finding, not just in the analysis conducted under the first factor but in the impact that a finding of "commercial" or "educational" has in the analysis conducted under the fourth factor, which considers "the effect of the use upon the potential market for or value of the copyrighted work...." 17 U.S.C. § 107(4). A conclusion that a use is "commercial" weighs against a finding of fair use and, in fact, creates a "presumption" of market harm in the fourth fair use factor. *Sony,* 464 U.S. at 451, 104 S.Ct. at 793. I conclude that the use of coursepacks in this case is not "commercial" within the meaning of section 107(1)'s "purpose and character of the use" language alone, but I am even more convinced that it is not "commercial" in view of section 107(4)'s "market harm" language: "the effect of the use upon the potential market for or value of the copyrighted work...." § 107(4).

The Supreme Court has explained the presumption of market harm as follows:

The purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create. The prohibition of such noncommercial uses would merely inhibit access to ideas without any countervailing benefit.[] Thus, although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter. A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.

*Sony,* 464 U.S. at 450–51, 104 S.Ct. at 792–93 (footnote omitted).

To repeat, the content of the coursepacks was not controlled by MDS but by the professors; and "the nature and objects of the selections made" by the professors were plainly nonprofit and educational. *Campbell,* 510 U.S. at 578, 114 S.Ct. at 1171 (internal quotation marks and citation omitted). The professors selected excerpts, not out of any motive for financial gain, but solely in order to enrich the educational experiences of their students. MDS made *no* selections; its motives for the activity that is challenged by the plaintiffs are not relevant.

It is consistent with the copyright scheme to find the use of these coursepacks to be noncommercial, to presume that they do not inflict market harm, and to require the publishers to prove that MDS's use is harmful to the value of the copyrighted works. Presuming that MDS's copying is not harmful to the value of the copyrighted works is appropriate because the identity and content of the excerpts is controlled entirely by persons whose motives are purely educational. Only where the use of copyrighted materials is directed by those seeking financial gain from the substance-based selection is it appropriate to *presume* that the secondary user is capturing profits that the creators of the works expected to capture and that may be important to maintaining incentives to create new original works. Similarly, the secondary product is appropriately viewed with suspicion—and presumed to upset the creator's incentives—when the party driving the use is primarily seeking to profit from its selections; where the selector acts in order to enrich his own coffers, it is less likely that society will benefit from his actions more than it will suffer from the resulting disincentives to create new works.

With regard to the professor-directed creation of coursepacks, it is not appropriate to presume that the practice of excerpting some materials harms the authors' rightful market and secures a benefit only to the excerpters. The more reasonable presumption is that society benefits from the additional circulation of ideas in the educational setting when those who direct the practice have no personal financial interests that would drive them to copy beyond the parameters of purely educational, and fair, use. The professors have no financial reason to copy mere excerpts when the entire works should be assigned, and their selections should not be presumed to harm the market for the original works and lessen the incentives for authors to write or publishers to publish new works. Rather, such harm must be demonstrated. Society benefits when professors provide diverse materials that are not central to the course but that may enrich or broaden the base of knowledge of the students. Society is not benefitted by establishing a presumption that *discourages* professors from exposing their students to anything but complete original works even when most of the work is irrelevant to the pedagogical purposes, and students are not benefitted or authors/publishers *justly* compensated if students are required to purchase entire works in order to read the 5% or 30% of the work that is relevant to the course.

And so, in my view, the majority's market harm analysis is fatally flawed: If market harm is presumed when excerpts are selected by professors and market harm is proven when fees are not paid, we have ceded benefits entirely to copyright holders when we are actually required to engage in "a sensitive balancing of interests," *Sony,* 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40, between "the interests of authors ... in the control and exploitation of their writings ... on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Id.* at 429, 104 S.Ct. at 782. The majority apparently does not really accept the firmly established principle that copyright monopoly privileges "are neither unlimited nor primarily designed to provide a special private benefit[; rather, the privileges exist to achieve] an important public purpose ... to motivate the creative activity of authors [*and*] to give the public appropriate access to their work product." *Id.*

The coursepacks fit within the *exception* to the "transformative" quality requirement, and the *predominant* character of the use of excerpts in coursepacks is not commercial but "nonprofit educational." The first factor therefore favors a finding of fair use.

**B.**

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), recognizes that fair use is more difficult to establish when the work being used is at "the core of intended copyright protection." *Campbell*, 510 U.S. at 586, 114 S.Ct. at 1175. Factual compilations, such as telephone book listings and football rosters, with only a small element of creativity and originality may be used more freely than creative works. *Feist*, 499 U.S. at 348–51, 111 S.Ct. at 1289–91. I agree with the majority that the materials copied in this case are much closer to the core of work protected by copyright than to the mere compilations of raw data in the phone books in *Feist*.

The second factor, on these facts, does little more than confirm that the works at issue are protected by copyright and may only be used "fairly." Thus, the fair use examination properly proceeds to factors three and four to determine whether this use of the excerpts is fair.

**C.**

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). I will not comment at length on this issue but will only note that I believe the majority has misunderstood this factor. The majority reasons that "to the extent that the third factor requires some type of assessment of the 'value' of the excerpted material in relation to the entire work, the fact that the professors thought the excerpts sufficiently important to make them required reading strikes us as fairly convincing 'evidence of the qualitative value of the copied material.' " Maj. op. at 1389 (citation omitted). However, the fact that the professors required students to read the excerpts says nothing whatsoever about the "substantiality" of the excerpted material *in relation* to the entire work. To the extent that the professors' decision to excerpt the material has any meaning, it suggests that the excerpts stand *separate* from the entire work, not that they are central and substantial to the entire work. The strongest inference is that the unassigned balance of the

work bears minimal relevance to the assigned excerpt; if it were otherwise, the whole would likely have been assigned.

Additionally, I am puzzled by the majority's statement that the third factor may have more significance for the 95–page excerpt that is 30 percent of the entire work than for the 17–page excerpt that is 5 percent of the entire work, but that in each instance, the third factor weighs against a finding of fair use. The majority apparently sees no important analytical difference between a 30% excerpt and a 5% excerpt. There is no bright-line rule to tell us how large of an excerpt renders it unfair as a matter of law, nor how small an excerpt is so small as to be conclusively fair. In *Sony*, the Court found the use to be fair even though the *entire* work was reproduced, whereas in *Harper & Row* the use was found to be unfair even though only 300 words of copyrighted material—an insubstantial portion of President Ford's memoirs—were reproduced without permission.

The third factor turns not only on the quantity of the materials used, but also on their quality and importance. *Campbell*, 510 U.S. at 586–87, 114 S.Ct. at 1175.

In the context of a musical parody's use of a copyrighted song, the Supreme Court interpreted this factor to assess whether the quantity and value of the materials used were reasonable in relation to the purpose of the copying, noting that "the extent of permissible copying varies with the purpose and character of the use." *Id.* As the Supreme Court acknowledged, "[t]he facts bearing on this factor will also tend to address the fourth [factor, which evaluates market effect], by revealing the degree to which the parody may serve as a market substitute for the original or potentially licensed derivatives." *Id.* Thus, we should ask whether such substantial portions of a copyrighted work were used that a coursepack supersedes the copyrighted work, "fulfilling demand for the original." *Id.* at 588, 114 S.Ct. at 1176.

There is no evidence whatsoever that any of the six excerpts in the coursepacks are so substantial as to supersede the original works. The only evidence of record is the

professors' declarations that they do not excerpt material when they would otherwise assign the entire work and the expressed preference of one publisher to have the entire work assigned rather than excerpted. The publishers have submitted a declaration stating that, in accordance with established practices, permission would have been denied, even if sought, with regard to the excerpt from *Public Opinion,* by Walter Lippmann. The *publisher* considers the excerpt so lengthy and the published edition sufficiently inexpensive that the book should have been purchased rather than copied with permission, for a fee. The declarant opined that copying 46 pages would adversely affect book sales, but offered no factual support for this statement. The fact that the publisher would prefer the book to be purchased is not relevant to the third-factor analysis. Each of the professors who delivered the materials to MDS signed a statement that he would not otherwise have assigned the copyrighted work to the class. Nothing in the record contradicts these declarations.

The majority appears to dismiss these declarations only because the professors did not further declare that they would not have assigned coursepacks that included the cost of a minimal permission fee; "what seems significant to us is that none of these affidavits shows that the professor executing the affidavit would have refrained from assigning the copyrighted work if the position taken by the copyright holder had been sustained beforehand.... [The professors do] not say that [they] would have refrained from assigning" the contested works if they had known that the copyshop had been required to pay a permission fee. Maj. op. at 1388. Indeed, they did not say that; and there are a good many other things about the assigned excerpts that they did not say. But those unstated matters do not diminish in any way the truth or the force of what was said. This court should not expect the professors to assert that had the publishers done what they have no right to do, the professors would not have assigned the materials. If the publishers have the right to charge one penny per page copied, they also have the right to charge $50 per page copied. It is irrelevant and unknowable to ask how high the fees charged for permission would have to be before the professors would not assign the excerpts if the copyshop paid permission fees.

The lengthiest excerpt used in one of the coursepacks comprised 30% of *Farewell to the Party of Lincoln: Black Politics in the Age of FDR,* by Nancy J. Weiss, the original copyrighted work. Other excerpts ranged from 5% to 18% of the original works. There is no evidence to suggest that even the 30% selected from Weiss's book extracted the heart of the work rather than just those portions that the professor deemed instructive for his limited classroom purposes. The record is simply silent on the point. *Cf. Harper & Row,* 471 U.S. at 565–66, 105 S.Ct. at 2233–34. Given the uncontroverted declarations of the professors that they would not have assigned the original works even if copied excerpts were not available, there is no basis to conclude that the portions extracted from the copyrighted works were so substantial that the resulting coursepacks superseded the originals. As the district court noted, the six excerpts at issue in this case "are truly 'excerpts,' and do not purport to be replacements for the original works." *Princeton,* 855 F.Supp. at 910.

There is absolutely no evidence in the record to support a finding that the copyrighted works at issue were excerpted so substantially that the coursepacks superseded the original works or otherwise exceeded the proper educational purposes that could justify the reproduction. Thus, the third factor favors a finding of fair use.

### D.

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Under this factor, courts must consider the extent of market harm caused by the particular actions of the alleged infringer and "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590, 114 S.Ct. at 1177 (internal quotation marks omit-

ted). The fourth factor is the single most important element of fair use, *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233–34, and "must take account not only of harm to the original but also of harm to the market for derivative works." *Id.* at 568, 105 S.Ct. at 2234.

I have concluded that analysis under the first factor establishes the character of the use of coursepacks as noncommercial, and that, therefore, a proper analysis under the fourth factor begins with a rebuttable resumption that the plaintiffs have suffered no market harm and thus have the burden of proof on market effect. *See* part III.A.ii., *supra.* But, even in the absence of a presumption against market effect, the fourth factor, correctly construed, weighs in favor of a finding of fair use on the record before us.

For plaintiffs to prevail, there must be at least a meaningful likelihood that future harm to a potential market for the copyrighted works will occur. In *Sony,* the Court held:

> A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.... What is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists.

*Sony,* 464 U.S. at 450–51, 104 S.Ct. at 792–93. Works or uses that creators of original works would "in general develop or license others to develop" make up the market for potential derivative uses. *Campbell,* 510 U.S. at 592, 114 S.Ct. at 1178. The plaintiffs certainly have not demonstrated that the coursepacks affected the market for the original copyrighted works. Neither have they presented any evidence of likely harm to their potential market for derivative works, such as *published* anthologies. Remarkably, they have limited their showing of "market effect" to the loss of *permission fees* that they would like to receive from copyshops like MDS. But that is not a "market harm" within the meaning of section 107(4). To prove entitlement to permission fees, the publishers must show market harm and the

market harm they claim is the loss of permission fees. MDS's coursepacks would inflict "market harm" if they damaged the *value* of the original work or the *value* of derivative products such as coursepacks the publishers might wish to market.

The original panel opinion, now vacated, stated:

> [E]vidence of lost permission fees does not bear on market effect. The right to permission fees is precisely what is at issue here. It is circular to argue that a use is unfair, and a fee therefore required, on the basis that the publisher is otherwise deprived of a fee.

*Princeton Univ. Press v. Michigan Document Services,* No. 94–1778, 1996 WL 54741, at *11 (6th Cir. Feb.12, 1996), *reh'g granted,* 74 F.3d 1528 (6th Cir.1996). The majority now claims that this charge of circular reasoning "proves too much." The majority asks the reader to

> [i]magine that the defendants set up a printing press and made exact reproductions—asserting that such reproductions constituted "fair use"—of a book to which they did not hold the copyright. Under the defendants' logic it would be circular for the copyright holder to argue market harm because of lost copyright revenues, since this would assume that the copyright holder had a right to such revenues.

Maj. op. at 1386.

The majority's logic would *always* yield a conclusion that the market had been harmed because *any* fees that a copyright holder could extract from a user if the use were found to be unfair would be "lost" if the use were instead found to be "fair use." The majority acknowledges that "a copyright owner will normally be able to complain that an asserted fair use may cause some loss of revenues in potential licensing fees" but resolves this problem by restricting its consideration of the loss of permission fees to the case of derivative markets that are " 'traditional, reasonable, or likely to be developed markets.' " Maj. op. at 1387 (quoting *American Geophysical Union v. Texaco,* 60 F.3d 913, 930–31 (2d Cir.), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 594, 133 L.Ed.2d 514

(1995)). Under this approach, the majority would find that the copyright holders' monopoly over potential uses of the copyrighted works at issue in *Princeton* includes "the selling of permission to reproduce portions of the works for inclusion in coursepacks—and the likelihood that publishers actually will license such reproduction is a demonstrated fact." Maj. op. at 1387.

The majority cites *Harper & Row* and *Campbell* as support for its reasoning that the mere loss of licensing fees—to which the copyright holder may or may not be entitled—is proof of market harm. The majority notes that in *Harper & Row*, the plaintiff did not challenge a use (the unauthorized article's direct quotes) based on its impact on sales of the entire work (the not-yet-published memoirs) but based on its harm to the market for the licensing of excerpts. There is a subtle but important distinction to be made between the facts in *Harper & Row* and the facts in this case. In *Harper & Row* there was proof that the copyright holder conceived of a potential derivative work (the planned *Time Magazine* articles) and took meaningful steps to aid in the creation of that derivative work and to capture profits from that creation. The *value* of the planned derivative work was harmed by the defendants' unauthorized use of the original work; the copyright holder lost its contract with *Time Magazine*—and concomitant fees—for the exclusive right to print prepublication excerpts of President Ford's memoirs when *The Nation Magazine* illicitly obtained a copy of the unpublished manuscript and produced a short article quoting from the heart of the manuscript. Thus, in *Harper & Row*, the *value* of the original work *in a derivative market that was targeted by the copyright holder* was harmed by the unauthorized use of the work. There is no similar evidence of injury to the value of a work in this case.

First, there is no evidence that the publishers, here, planned to create any products for a derivative market; no evidence, for instance, that the copyright holders sought to publish or license a competing compilation of excerpts to attract the interest, for instance, of the students in Professor Dawson's interdisciplinary course "Black Americans and the Political System." Second, even if there was evidence that the publishers had contemplated such a product, there is no evidence that the publishers' derivative compilation would be devalued by defendant's production of coursepacks; that is, there is no evidence that such a compilation would earn less because of the existence of coursepacks. In *Campbell*, 510 U.S. at 591–96, 114 S.Ct. at 1178–79, for instance, the Court declined to find market harm based solely on undisputed evidence that the unauthorized user created a profitable product—rap-parody—from the original; the Court noted that the rap-parody version was not shown to affect the market for an authorized, non-parodic rap version of the original. It might at first appear that the publishers are, by definition, able to design and market a collection of excerpts and that the existence of other, unauthorized, collections will necessarily replace some of the authorized copies and thereby leach profits that the publishers could otherwise capture. However, neither the facts on this record nor any case law support such a leap in logic.

The fact is that the plaintiffs are not able to create a market for the product that MDS produces. To the extent that MDS serves a market at all, it is one created by the individual professors who have determined which excerpts from which writers they wish to comprise the required reading for a particular course. If the publishers decided to create an anthology of excerpts from its copyrighted works on, for example, "The Black Experience," it would not fill the market niche created by Professor X who is interested in very different materials. Indeed, the publishers do not claim to have lost an account for customized materials with a specific professor because of a copyshop coursepack; nor do they claim to be prepared to enter this highly-customized market. The argument that the publishers seek to enter the derivative market of customized materials by licensing MDS and other copyshops, who create such compilations, and that MDS's publication of unauthorized compilations interferes with their ability to obtain licensing fees from other copyshops simply returns the publishers to their original circular argument

that they are entitled to permission fees, in part, because they are losing permission fees.

The publishers do not identify potentially marketable specialty materials and license copyshops to produce the compilations as true derivative works; rather, the publishers reject any active role in identifying potential derivative markets or creating derivative works and seek to impose a tax/surcharge on the unique compilations that are designed by individual professors and assembled by MDS for use in a specific course. Thus, the facts do not suggest that the value of any conceived derivative work has been damaged by the defendant's production of coursepacks. The key distinction is between simple economic detriment to the copyright holder when permission fees are not paid by the user—a "harm" that will always be present—and harm to the *value* of a product—either the original work or a derivative product—that the copyright holder seeks to market. Application of the value/detriment distinction serves the purposes of the Copyright Act as the established/reasonable definition advanced by the majority does not.

The guiding principle of the Copyright Act is that the financial earnings of original works be channeled exclusively to the creators of the works insofar—and *only* insofar—as they are necessary to motivate the creation of original works and do not excessively impede the advancement of science and the arts through the public dissemination of knowledge, research, scholarship, newsreporting, teaching, criticism, and the like. The copyright holder's statutory monopoly does not encompass profits from derivative works that the copyright holders do not themselves seek to market or that do not harm the value of works that the copyright holders do seek to market; the monopoly privileges need not include these profits because these profits do not function as incentives to prospective creators.

Here, there is no indication of harm to the market of the original copyrighted works. There is no evidence that the coursepacks act as a substitute for purchase of the entire works. MDS has alleged that no sale of a copyrighted book has been lost to the publishers because of the coursepacks, and MDS

has submitted declarations from professors stating that the professors do not request excerpts when they would otherwise assign the entire work. Because the professors would not have assigned the original works in any case, the students who purchased coursepacks were not a demonstrable market diverted from purchasing the works. If it had any effect at all, use of the excerpted materials enhanced the prospect that the original works might later be of interest to the student. Students might purchase the copyrighted works when, for example, taking other courses in the same discipline, conducting more extensive research into a subject touched upon in an excerpt, or doing graduate work in a broader field to which the excerpted material later appeared relevant and was recalled. The publishers have produced no evidence that any sale of an original work has been lost.

Nor is there any indication of harm to a derivative market from which authors or their publishers expected to receive profits that were necessary to their respective decisions to write or publish the original works. As I have said, the publishers do not claim that they sought to publish compilations or anthologies but were thwarted by the existence of the coursepacks. There is no evidence that the publishers are interested in or capable of customizing their copyrighted works to accommodate the specific, limited, and frequently updated requests of individual professors. There is no evidence even that the publishers seek to license the compilation of excerpts by a third party who is equipped to assemble the compilations but refuses to do so without an agreement that the publishers grant it exclusive rights to publish the excerpts. Thus, there is no evidence that the value of the copyrighted works in a potential market was harmed in any way by the production of the coursepacks challenged in this case.

Therefore, I would conclude that there is no evidence of market effect and that the fourth, and most important factor, weighs decisively in favor of "fair use."

### E.

I disagree with the majority's conclusion that copyshop permission fees provide an

important incentive to authors and publishers. The right—and its parameters—to monopolize profits from original works is created by statute and limited to those profits that provide necessary incentives to the creation of new works without unduly impeding the flow of information in the public, especially where the free flow of information serves socially significant functions, including teaching through multiple copies for classroom use.

More than one hundred authors declared on the record that they write for professional and personal reasons such as making a contribution to a particular discipline, providing an opportunity for colleagues to evaluate and critique the authors' ideas and theories, enhancing the authors' professional reputations, and improving career opportunities. These declarants stated that the receipt of immediate monetary compensation such as a share of licensing fees is *not* their primary incentive to write. The declarants advocate wide dissemination of excerpts from their works via coursepacks without imposition of permission fees where the works in their entirety would not have been assigned in any case. The fact that incentives for producing higher education materials may not revolve around monetary compensation is highly relevant. The inclusion of excerpts in coursepacks without the payment of permission fees does not deprive authors of the rewards that the record indicates authors value, such as recognition.

The majority dismisses the motives of the authors—the actual creators—and concludes that what matters is the incentives to the publishers who hold the copyrights. The majority further concludes, without any evidence, that the licensing income from the permission-to-copy market is significant to publishers in individual cases, and that publishers need the economic incentive of licensing fees to publish academic works. The majority speculates: "If publishers cannot look forward to receiving permission fees, why should they continue publishing marginally profitable books at all? And how will artistic creativity be stimulated if the diminution of economic incentives for publishers to publish academic works means that fewer academic works will be published?" Maj. op. at 1391–92.

Despite the initial appeal of this reasoning, it is far from clear that the licensing income is significant to publishers in their decisions about whether to publish marginally profitable books. The fact that licensing income provides some welcome income in the aggregate does not mean that it provides an incentive to publishers to act in individual cases. There is, in fact, no indication that the paltry permission fees affect the publishers' decisions about whether to publish in individual cases. Given that the per-page fee currently demanded by publishers—and, until now, successfully extracted from other copyshops perhaps too timid to "make a federal case" of the issue—is so small that it is almost inconceivable that this fee, or the anticipation of this fee, affects in any meaningful way the publishers' decisions about whether to publish any given work. MDS's use of the copyrighted works appears to have no impact on incentives to authors to create new works, and may even *provide* authors incentive to write, thereby advancing the progress of science and the arts. But, like the majority, I speculate on the matter; there is no evidence in the record, either way.

Finally, a word about the majority's argument that the unenacted legislative history of the Copyright Act instructs us that the MDS's copying function is not a fair use under the enacted provisions of sections 106 and 107.

### F.

The majority opinion stresses the fact that Congress "initiated and supervised negotiations among interested groups—groups that included authors, publishers, and educators—over specific legislative language [and that m]ost of the language that emerged was enacted into law or was made a part of the committee reports." Maj. op. at 1390. However, what were not "enacted into law," but only made a part of the conference committee reports, are the Classroom Guidelines upon which the majority so heavily relies to decide how the language enacted into law applies. Indisputably, the Classroom Guidelines assure educators that nonprofit copying

for educational purposes of "not more than 1,000 words" is fair use when "[t]he inspiration and decision to use the work and the moment of its use for maximum teaching effectiveness are so close in time that it would be unreasonable to expect a timely reply to a request for permission." H.R. REP. No. 1476 at 68–71. The Classroom Guidelines "prohibit[ ] ... [c]opying ... used to create ... anthologies, compilations or collective works." H.R. REP. No. 1476 at 69. But, as the majority opinion acknowledges, that language did not survive congressional debate and was not enacted into law.

Despite the well-settled rule that legislative history is irrelevant and inappropriate to consider except to clarify an ambiguity in the text of a statute, the majority relies upon the legislative history without identifying any ambiguity in the statute, but only because "[t]he statutory factors are not models of clarity, ... the fair use issue has long been a particularly troublesome one ..., [and other] courts have often turned to the legislative history when considering fair use questions." Maj. op. at 1390. I wish to emphasize in the strongest terms that it is entirely inappropriate to rely on the Copyright Act's legislative history at all.

As Justice Scalia has observed, "The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators." *Conroy v. Aniskoff, Jr.,* 507 U.S. 511, 519, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring). The Classroom Guidelines do not become more authoritative by their adoption into a Committee Report. "[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law." *City of Chicago v. Environmental Defense Fund,* 511 U.S. 328, ——, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994). We may not permit the statutory text enacted by both Houses of Congress and signed by the President "to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process." *West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 98–99, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991). That the Classroom Guidelines are not law should be reason

enough for this court to refrain from using them to find infringement, but this is not the only reason to reject out of hand arguments based on legislative history. Committee Reports are unreliable "as a genuine indicator of congressional intent" *and* "as a safe predictor of judicial construction." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 617, 111 S.Ct. 2476, 2488, 115 L.Ed.2d 532 (1991) (Scalia, J., concurring). Committee Reports do not accurately indicate congressional intent because they do not "necessarily say anything about what Congress as a whole thought," *even if* all the members of the Committee "actually adverted to the interpretive point at issue ... [and] were in unanimous agreement on the point." *Id.* at 620, 111 S.Ct. at 2489. The members of Congress who voted for the statutory language of section 107 could have had any variety of understandings about the application of the fair use factors; all we know for certain is that the full House, the full Senate, and the President, pursuant to the procedures prescribed by the Constitution, enacted into law the text of section 107, and did not enact the standards of the Classroom Guidelines. *Id.* at 621, 111 S.Ct. at 2490. Committee Reports do not reliably further consistent judicial construction. I subscribe wholeheartedly to Judge Harold Leventhal's observation that "the use of legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy,* 507 U.S. at 519, 113 S.Ct. at 1567 (Scalia, J., concurring). "We use [Committee Reports] when it is convenient, and ignore them when it is not." *Mortier,* 501 U.S. at 617, 111 S.Ct. at 2488.

The statutory language of section 107, like most statutory language, may not be a "model of clarity," and the fair use issue, like many issues of law we face, may be a difficult or "troublesome" one, but neither of these inconveniences is a substitute for the requisite ambiguity that, alone, justifies recourse to legislative history.

Our duty in this case, as in all cases that require application of a statute, is to apply the broad dictates of the statute to the unique factual situations presented by the evidence. The fact that the Supreme Court

has indulged in explanatory side-references to the Classroom Guidelines, *see, e.g., Campbell,* 510 U.S. at 574–78, 114 S.Ct. at 1170; *Harper & Row,* 471 U.S. at 549–53, 105 S.Ct. at 2224–27, does not diminish in any measure the *rule* that legislative history is not a proper source of authority for this court when the language of the statute is not analogous. It is particularly inappropriate to rely on the specific language of the Classroom Guidelines as an interpretive tool when we know that members of Congress actually considered the language and rejected it in favor of the very language now claimed to lack clarity. The majority substitutes language contained only in pre-enactment political maneuvering of Congress for our obligation to rely, as we are required to do, on the rich body of case law that properly guides our application of the statutory factors to the specific facts of a case. In *Campbell,* 510 U.S. at 574–78, 114 S.Ct. at 1170, the Court noted that "[t]he task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis."

The case for copyright infringement is very weak indeed if the court must rely on the unenacted theater of Committee Reports to find infringement. The fact that Congress saw fit, very likely in the interests of political expediency, to pay unusual deference to the "agreement" of interested parties about what *they* would like the law to be, even to the point of declaring (but not in the statute) that the parties' agreement was part of the committee's "understanding" of fair use, does not affect the rule of construction that binds this court.

In sum, even if the four statutory factors of section 107 are not "models of clarity" and their application to the facts of this case is "troublesome"—a challenge of the kind federal appellate judges are paid to face every day—the four factors are not ambiguous. Therefore, we may not properly resort to legislative history. I am satisfied to rely exclusively upon the evidence and lack of evidence on the record before us and the plain language of the Copyright Act and its construction in the case law; and they lead me to conclude that MDS's compilation into coursepacks of excerpts selected by professors is a "fair use" of the copyrighted materials.

## IV.

For all the foregoing reasons, I conclude that MDS did not infringe upon the copyrights of the publishers.